UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA


HON. CHRISTOPHER M. KLEIN, JUDGE

DEPARTMENT 35

```
_____
                              )
NEXTGEAR CAPITOL, INC.,       )
                              )
            Plaintiffs,       )
                              )
vs.                           ) No. 13-33462-C-7
                              )
DANIEL CURTIS GORDON,         ) No. 14-02026
                              )
            Defendant.        )
_____)
```


FINDINGS OF FACT AND CONCLUSIONS OF LAW

August 20, 2015




APPEARANCES:

For the Debtor/Defendant:  MICHAEL LUSK
                           Attorney at Law

For Sagaria Law:           JOE ANGELO
                           Attorney at Law




JILL R. MCLEOD, CSR #10071, Certified Pro-Tem Reporter

1  AUGUST 20, 2015                                    9:00 A.M.

2  DEPARTMENT 35

3                        PROCEEDINGS

4      THE COURT:  This is the time set for continued trial in

5  the matter of the case of Daniel Gordon regarding 11 USC

6  Section 329(b) for the debtor's disgorgement of fees.

7      Let's have entries of appearance, beginning with counsel

8  for the movant.

9      MR. LUSK:  Michael Lusk, your Honor, appearing on behalf

10  of the debtor, Daniel Curtis Gordon.

11      THE COURT:  Mr. Lusk.  For the defendant?

12      MR. ANGELO:  Good morning, your Honor.  Joe Angelo

13  appearing for Sagaria Law.

14      THE COURT:  All right.  We've already had trial and I

15  have made findings -- I've had closing argument and now I am

16  about to make findings of fact and conclusions of law, which

17  I will do orally on the record, pursuant to Federal Rule of

18  Civil Procedure 52, as incorporated by Federal Rule of

19  Bankruptcy Procedure 7052 and 9014.

20      The debtor, Daniel Gordon did business as Second Chance

21  Auto Group, approached Sagaria law, Scott Sagaria to file a

22  Chapter 7 case.  At the time, he was tied up with some

23  litigation involving an entity known as Nextgear.  He was

24  signed up to do a straightforward Chapter 7 case.  He was

25  charged $2,494.  The case was filed on October 17, 2013 as a

1  Chapter 7 case and the case proceeded along normally.

2      The communication that Mr. Gordon had was limited to

3  having met Mr. Sagaria once and then dealing with

4  Mr. Sagaria's associate, Mr. Johnson; and more importantly,

5  with a paralegal, at least I gather it is a paralegal, named

6  Nate, Nate Streich, S-t-r-e-i-c-h, who shows as a

7  paralegal/debt negotiator, is the way he signs his e-mail

8  documents, that are in evidence.  And looking at Exhibit G,

9  Nate operated as the primary contact.  The only time that

10 Mr. Gordon saw or talked with Mr. Sagaria, after initially

11 meeting him, was at the meeting of creditors.  Mr. Sagaria

12 was there for that meeting.

13     Shortly before the deadline to object to discharge,

14 there was filed an adversary proceeding by Nextgear, seeking

15 to have the debt, the Nextgear debt excepted from discharge.

16 That was filed as Adversary Proceeding Number 14-2026 and it

17 was filed on January 21, 2014.

18     A summons was issued.  The complaint alleged fraud and

19 defalcation in a fiduciary capacity, Section 523(a)(4); and

20 money obtained through false pretenses, false representation

21 or actual fraud, Section 523(a)(2)(A).

22     It was focused on several vehicles that were purchased

23 through an auto auction and that were the subject of funds

24 advanced by Nextgear, which funds were not paid.  There was a

25 GMC G-1500 van, there was a 2007 Cadillac SRX, there was a

1  2008 Honda Accord.  And it was, all that, the total advances

2  were 24,000 -- that is $24,475.

3       And also was alleged that in, not paying, because

4  Nextgear was not paid, there was willful and malicious

5  injury.  And the request was for both a money judgment and

6  for a determination of nondischargeability.

7       The certificate of service of the summons and complaint

8  established that it was mailed to the debtor and to Scott

9  Sagaria, the counsel for the debtor, as well as the trustee

10  and the Office of the United States Trustee, and that that

11  was done on January 22, 2014.

12       On March 25, 2014, a request for entry of default was

13  made.  On March 31, 2014, default was entered.  And an order

14  regarding default judgment procedures was issued on -- also

15  on March 31, 2014.  A motion for entry of default judgment

16  was filed on April 28, 2014.  That is Docket Item Number 18

17  in the adversary proceeding.  There was a notice of hearing.

18  There was a status conference on, in this court, on

19  August 20, 2014.  The default, the motion for default

20  judgment was granted on -- also on August 20, 2014.  That is

21  Docket Item Number 37.  The adversary proceeding was closed

22  on September 18, 2014.

23       At that point, there is absolutely nothing of record

24  from the defendant in the adversary proceeding.

25       On January 21, 2015, there was filed by Michael Lusk,

1 now representing the debtor, a notice of motion and motion

2 for relief from judgment in the adversary proceeding.  There

3 was an opposition to that motion, there was the reply, there

4 was a hearing on March 10, 2015.  The hearing was rescheduled

5 and the adversary proceeding was informally reopened on

6 March 26, 2015.  A discovery plan was filed, the answer to

7 complaint was filed.

8      There was also a motion presented by the debtor, through

9 counsel, seeking an accounting and disgorgement of monies.

10 And with respect to that motion, I pointed out that it

11 belonged as a motion in the parent case and I initially set

12 trial for July 18, or that is, July 9, 2015.  And ultimately,

13 the trial was held this past week.

14      Now, the entire record of the adversary proceeding

15 reflects nothing from Sagaria Law.  However, the whole point

16 of the motion under Section 329 is that Mr. Gordon indeed

17 employed Sagaria Law to defend him in the adversary

18 proceeding and Mr. Gordon did not -- and Mr. Gordon was not

19 represented in the adversary proceeding.

20      The evidence includes Exhibit A.  That shows a

21 communication between, or written by Mr. Angelo of Sagaria

22 Law, Joe Angelo, associate attorney, Monday, February 3,

23 2014, at 4:07 p.m., seeking information about it, and then it

24 notes that "Nate forwarded me your e-mail regarding questions

25 you had regarding the complaint filed against you."

1      And the communication points out that adversary

2   proceedings are outside the scope of the retainer agreement,

3   and they, the firm, Sagaria Law would need to determine

4   whether it was a case they would handle and requested more

5   information.

6      Exhibit A contains the e-mail chain of exchanges back

7   and forth, February 3, February 6, multiple items; and

8   Mr. Angelo ultimately responds with an e-mail on February 6,

9   2014 at 2:40 p.m., saying that the firm, Sagaria Law will

10  undertake the representation and that the cost would be a

11  $5,000 initial retainer, billed against that amount at an

12  hourly rate at $295 for himself and any other associate

13  attorney, and $105 for any paralegal; and then thereafter,

14  once that retainer is used up, there would be further deposit

15  of $2,500, and if it proceeds to trial, there would be a

16  $7,500 retainer deposit.  Actually it's 7 comma 5, followed

17  by three 0's, but it's plain that really was a typographic

18  error for $7,500.

19     On February 6, also Mr. Gordon responds that he had an

20  attorney, who's familiar with Nextgear, and he had been in

21  communication with the lenders and Nextgear, until the

22  bankruptcy notice was filed, and said, noted 14,500 plus fees

23  seems high, especially for, "with me having all the proof of

24  no fraud intended.  Should I let another attorney handle

25  this?"  And he points out the attorney who had been handling

1  it before was Edward Mislah, M-i-s-l-a-h, in Sacramento.

2      And Mr. Angelo responded later on February 6 that the

3  breakdown of pricing was just to give an overall picture and

4  notes that the time commitment for an adversary is the reason

5  why it's outside of the scope of a Chapter 7 retainer

6  agreement.

7      And Mr. Gordon responds on February 24 at 8:02 a.m.,

8  "Joe, can I make an appointment with you regarding the

9  adversary proceeding?"

10     And the next exhibit is the attorney fee agreement with

11 Sagaria Law.  That is Exhibit B, which is executed on

12 April 4, 2014, signed by Mr. Angelo and by the debtor, which

13 covers the adversary proceeding and provides for the billing

14 as described and calls for an initial $5,000 retainer.

15     Bear with me a minute.

16     (Pause in proceedings.)

17     THE COURT:  And also on April 4, 2014, the $5,000 was

18 paid.  And the Exhibit B contains a receipt for $5,000.  The

19 receipt says, "For adversary."  Account, $5,000; payment,

20 $5,000.  It's Receipt Number 361826.

21     The communications then essentially ceased from Sagaria

22 Law to Mr. Gordon.  Mr. Gordon testified that he would call

23 Nate at Sagaria Law, that is Nate Streich, who's, as I

24 indicated, signs his name as a paralegal, and Nate would pass

25 on his information or forward his telephone calls.

1  Literally, act, in effect, as the secretary and put the call

2  through to Mr. Angelo.  But what happened was Mr. Angelo

3  would not pick up the phone.  And so Mr. Gordon testified

4  that, ultimately, he testified, quote, "When I called, they

5  just put me on hold for so long that I would just give up,"

6  unquote, and then hang up the telephone.  He testified that

7  he did this several times a day and then he testified that,

8  ultimately, whenever he called Sagaria Law, his phone, his

9  call would instantly go to a busy signal.  He drew the

10  inference that Sagaria Law had blocked his number.

11      I believed his testimony.  I agreed and I so hold,

12  Sagaria Law blocked its client's telephone number, so that

13  the client could not communicate with them.

14      Then on August 1st, this is August 1st, 2014, Exhibit E,

15  Mr. Angelo sent an e-mail to Mr. Gordon saying, "I have left

16  a message with the other side to see if we can stipulate to

17  dismiss.  That was filed the other week.  If not, I will be

18  contacting you next week to work on getting a declaration on

19  file for the court to deny the request and let us proceed

20  with an answer.  Let me know if you have any questions."

21  That, of course, is the request, at that point, for entry of

22  default judgment.

23      Mr. Gordon had provided numerous e-mails, also, in

24  addition to his telephone calls.  Mr. Gordon responded on

25  August 4.  August 1st was a Friday, it was Friday at 2 p.m.

1  Mr. Gordon responded August 4.  "Okay.  I was wondering what

2  would happen.  I haven't had a word from you since April.  Is

3  there anything that you need from me?  Please call or

4  e-mail."

5      As I indicated, during that period from April to August,

6  there had been these multiple attempts to have, to

7  communicate with -- multiple attempts by Mr. Gordon to

8  communicate with Mr. Angelo.

9      That drew a response from Mr. Angelo on August 15, 2014,

10  e-mail, "Hi, Dan.  Quick question.  Were you the one who sold

11  the vehicles in question that were mentioned in the complaint

12  or did someone else actually handle the sale transaction?

13  Joe."  That was at 12:34 p.m. on August 15.

14      At 1 p.m. on August 15, Mr. Gordon responded to

15  Mr. Angelo, "Hey, Joe.  I am not the person who sold the

16  vehicles.  I was the investor and not involved in the

17  day-to-day operations."

18      That drew an e-mail back to Mr. Gordon from Mr. Angelo

19  on Friday, August 15, 2:36 p.m. "Did you make any payments to

20  Nextgear after BK filing?"  And that drew a response.  "Yes.

21  $20,000."  Which was a response that Mr. Gordon made at

22  3:21 p.m.

23      And at 3:27 p.m., Mr. Angelo says, "Any chance you can

24  send me proof of payment or receipt?"  At 3:32 p.m.,

25  Mr. Gordon says, "Yes.  I will send a copy of bank

1 statements.  Your office should have that already."

2     On August 31, following the hearing, at which nothing

3 was presented in opposition, in which there was no

4 appearance, I signed a default judgment in favor of Nextgear

5 Capitol, which provided Nextgear Capitol, Inc. shall have

6 judgment in its favor against defendant, Daniel Curtis

7 Gordon, in the amount of $43,431.29, which includes $293 for

8 costs of suit, and the $43,431.29 is to be -- is determined

9 to be nondischargeable pursuant to 11 USC Sections 523(a)(4)

10 and 523(a)(6).  And that was entered on August 31, 2014.

11     On September 18, Mr. Streich at Sagaria Law sends an

12 e-mail saying, "Hello, I am following up with you to see if

13 you got any of your questions answered as of yet?  If not,

14 please e-mail them to me again, so I will forward to

15 Mr. Angelo to address right away."

16     Well, that was referring to the fact that the -- that

17 Mr. Gordon was continually trying to get through to

18 Mr. Angelo and to Mr. Sagaria and never got farther than

19 Mr. Streich.

20     And then, as I indicated, the phone calls would go on

21 hold and would never be picked up, and eventually went to

22 being blocked.

23     So that is the e-mail I referred to from Mr. Streich on

24 September 18, 2014 at 6:30 p.m.  At 7:20 p.m. on that same

25 day, Mr. Gordon responds.  "Nate, maybe Mr. Angelo needed

1   more time to respond to Nextgear Capitol.  I did come in, did

2   come to you with issue in April.  Seems that a judgment was

3   in Nextgear's favor of $43,431.29.  It should be less than

4   half that, according to other documents.  Which way would I

5   proceed now?  There are still questions about how the

6   bankruptcy was filed.  I have never received a response to

7   previous inquiry.  Can I make an appointment to speak with

8   someone in your firm?"  That is the Sagaria Law Firm.

9       And the paralegal, Mr. Streich responds, "Dan, yes,

10  let's schedule a phone meeting to discuss all your questions

11  and to get you some answers.  You have a best time and date

12  next week?  I can look at our calendar and get you one."  And

13  that is on September 19 at 8:15 a.m.

14      That drew a response at 8:19 a.m. on the same day, four

15  minutes later, "I am open to any time or date."  That is from

16  response from the debtor, Mr. Gordon.

17      2:40 p.m., Mr. Gordon gets an e-mail from Mr. Streich

18  saying, "Mr. Angelo will call you Monday but I need to know

19  what time Monday afternoon works for you.  Please advise."

20  That is at 2:40 p.m.

21      The response from Mr. Gordon to Mr. Streich at 2:40

22  p.m., the same time was, "Any time."  Mr. Streich, at 2:45

23  p.m. says, "Dan, I have booked a time at 2 p.m. next Monday

24  for Mr. Angelo to contact you to discuss.  Thanks, and have a

25  great weekend."

1          Then on Monday, September 22, 2014, Mr. Gordon sends an

2    e-mail to Mr. Streich at 6:23 p.m., "Hey, Nate, I did not

3    receive a call today, as you booked.  Every time I contact

4    you, you state that Mr. Sagaria or Mr. Angelo will contact

5    me.  I have had no response from either since April.  Please

6    call me and advise.  Thanks, Dan Gordon."

7          At 10 -- on September 25 at 10:01 a.m., Mr. Gordon sends

8    an e-mail, "Nate, can you please call me."  At 7:31 p.m.,

9    Mr. Streich called or sent an e-mail to Mr. Gordon saying,

10   "Did Mr. Angelo call you like I asked?  If not, Scott wants

11   to set up a meeting with you.  Please advise."  Scott being

12   Scott Sagaria.

13         The response came back at 8:01 p.m., 30 minutes later,

14   "Hi, Nate.  I have not spoken with Mr. Angelo.  I would like

15   to make an appointment with Scott."

16         On September 29, Mr. Angelo sends an e-mail to

17   Mr. Gordon, "Please see attached.  I will need you to sign

18   the attached declaration.  Attempts at informally resolving

19   the adversary proceeding have not been successful.  The

20   creditor apparently changed its mind regarding settlement

21   this early, so we are going to continue proceeding with the

22   litigation.  Please let me know if you have any questions."

23         Attached to that is a notice of a hearing on defendant's

24   motion to vacate clerk's entry of default.  This is -- this

25   would be -- this was sent to Mr. Gordon September 29 and

1  would be set for hearing on October 14, 2014.

2      And of course, that is, this is a month -- well, the

3  e-mail is a month after the default judgment was entered.

4  And the motion to default, or to vacate default, which is

5  attached, says that it is premised on mistake, inadvertence

6  and excusable neglect.

7      The motion is based on the memorandum of points and

8  authorities and declaration of Daniel Curtis Gordon filed

9  concurrently herewith, the defendant's memorandum, this is

10  all in Exhibit H, contains the following:  "Prior to the

11  filing of the underlying Chapter 7 bankruptcy case,

12  Mr. Gordon, dba, Second Chance Auto Group, was involved in a

13  civil lawsuit, which had not been dismissed during the

14  pendency of Mr. Gordon's Chapter 7 bankruptcy.  Upon receipt

15  of the summons and complaint by United States mail,

16  Mr. Gordon was under the impression the legal documents were

17  received, were from the civil lawsuit wrapping up.

18  Mr. Gordon was not aware of any action required on his part."

19  That is on Page 1.

20      Page 2 says, "Defendant's lack of filing of a responsive

21  pleading was not done to defraud, delay or hinder the pending

22  adversary proceeding.  Defendant is not educated in the legal

23  field and is not familiar with the daily practice of law.

24  Defendant was under the impression that the Chapter 7

25  bankruptcy filing would cease all litigation against him and

1 his sole proprietorship.  Defendant had no reason to suspect

2 that additional litigation would be coming his way.

3 Believing that no action was required upon the receipt of the

4 documents, defendant knew nothing of any potential negative

5 ramifications.  His delay in filing the instant motion to set

6 aside was not deliberate or malicious and did not prejudice

7 any party to the action."

8      And then there is attached a declaration from Mr. Gordon

9 to sign, that says at Paragraph 3, "In January 2014, I

10 received in the mail, what I believed to be the closing legal

11 documents from the civil litigation matter that I was engaged

12 in immediately preceding the filing of the underlying

13 bankruptcy.  I erroneously believed that the present

14 adversary complaint was the conclusion of the former civil

15 litigation matter.  I did not -- I do not possess the legal

16 knowledge to differentiate between the two cases and the

17 ramifications for failing to respond.  I have retained

18 counsel in the present adversary to assist me in actively

19 litigating the present adversary case, should the court set

20 aside the clerk's default."

21      Well, when Mr. Gordon received that, he recognized that

22 the statements in the drafts were plainly false.  He had

23 hired the Sagaria Law Firm at the time -- or he had consulted

24 with Sagaria Law Firm promptly after he received the

25 adversary complaint.  There had been discussions about who

1  would represent Mr. Gordon in the adversary proceeding.

2  Mr. Gordon had signed an employment contract, a retainer

3  agreement to represent Mr. Gordon in the adversary proceeding

4  on April 4.  At a time when it was certainly possible to

5  retrieve the situation on any entry of default.  And that was

6  a retainer agreement that has the signature of Mr. Angelo,

7  who's the person who drafted this pack of lies that is

8  reflected in Exhibit H.

9      And on April 4, Mr. Gordon paid Sagaria Law Firm $5,000

10  to represent him in the adversary proceeding.  And

11  thereafter, Mr. Gordon got totally stone-walled by his own

12  client, or by his own counsel, and even stone-walled to the

13  point that, not only would they not pick up the telephone

14  when they knew he was on it but they finally just blocked the

15  number.

16      Mr. Angelo asked questions on cross-examination, well,

17  do you have phone company records that show that the number

18  was blocked?"  The answer was no.  And that does not,

19  however, establish the contrary.  The reality is that when a

20  number always goes to a busy signal, either the receiving

21  telephone is out of order, and he testified he is calling the

22  main Sagaria law office telephone number, or the number has

23  been blocked.  It's that simple.  I believed Mr. Gordon.

24      Well, Mr. Gordon's response was to fire Sagaria Law Firm

25  and he went back to -- and he sent communications to Sagaria

1  Law asking to have his files back.  Sagaria Law did not

2  respond, did not turn over his files.

3      He employed Mr. Mislah to represent him and sent -- and

4  even though Mr. Gordon's written requests to Sagaria Law had

5  been ignored, Mr. Mislah sent, by certified mail, a letter to

6  Scott Sagaria and Joe Angelo at Sagaria Law, requesting the

7  file of Mr. Gordon and reporting that Mr. Mislah's law

8  offices had been retained by Mr. Gordon to continue his

9  representation, and he enclosed a copy of the notice of

10 representation and said, "In representing Mr. Gordon, we need

11 to have a complete and accurate representation of what went

12 on in this matter.  To do so, we will have to have the

13 complete file of your representation of him in the bankruptcy

14 proceedings and the adversary proceedings, requested

15 information, sanctions information," which is in Exhibit I,

16 and requested materials by November 21, saying, "The time is

17 of the essence, so we can diligently and zealously represent

18 Mr. Gordon in the present proceedings."

19      Mind you, this is now a couple of months after the entry

20 of the default judgment on August 31, and the notice of

21 representation was executed by Mr. Gordon on November 14.

22      There also is, in evidence, Exhibit J, which is a copy

23 of a handwritten letter from Mr. Gordon that says,

24 "Mr. Sagaria, I request that your firm release to me all of

25 my paper and property regarding my bankruptcy."  And gives

1  the case number and the address to which the mail, the

2  materials were to be sent.  There is a certified mail receipt

3  attached.  The receipt is difficult to read.  The testimony

4  of -- but it shows certified mail was sent September 29.

5  That was before the Mislah matter.  And there was no response

6  from Sagaria Law.

7      In addition, Mr. Gordon, in evidence as Exhibit K, a

8  letter to Sagaria Law Firm from Mr. Gordon dated December 29,

9  2014.  "Can you send me the file or a copy of all documents

10 regarding my bankruptcy case."  Once again, signed by

11 Mr. Gordon with a certified mail receipt from the post

12 office.  No response.  Three communications to counsel.

13     Mr. Mislah recommends that Mr. Lusk take over the matter

14 and Mr. Gordon consented and then we proceeded to this action

15 under a Section 329.

16     On the eve of the initial hearing on the motion, or when

17 the motion, Section 329 was initially filed, that was the

18 point at which Sagaria Law responded by turning over some

19 materials and not before then.

20     Mr. Gordon testified that he requested that he be

21 refunded his $5,000.  Sagaria Law responded that they had

22 billed approximately slightly more than half of the amount.

23 Sagaria Law never provided an accounting of what it did.

24     There is no evidence that Mr. Angelo did anything, as a

25 matter of fact, or that Scott Sagaria did anything, before

1  the communications in August, which are communications of

2  facts that are so basic to an adversary proceeding, that you

3  would have expected that any competent lawyer would have

4  elicited that information in the initial interview over the

5  matter at the time the retainer agreement was signed.

6      (Pause in proceedings.)

7      THE COURT:  I note also that there was a question on

8  examination, when Exhibit Q was put in evidence, which is the

9  bankruptcy petition and schedules, whether Mr. Gordon had

10  ever physically signed an original version of the petition of

11  the schedules.  And Mr. Gordon's testimony was that he had

12  never physically signed any document in the bankruptcy case.

13  When asked if he knew what a wet signature was, and it was

14  explained that it was a signature in real ink with a pen, he

15  testified that he had never signed anything like that in the

16  case.  Once again, I believed his testimony on that.

17      (Pause in proceedings.)

18      THE COURT:  With respect to the $5,000, the precise

19  numbers on testimony were that Sagaria Law conceded that

20  $2,256.50 was conceded to be unearned, and that $2,743.50 was

21  alleged to be time charged, but as I concluded, no bill was

22  ever sent, no accounting was ever provided to the plaintiffs,

23  and that information came only after the motion to disgorge

24  fees was filed.

25      All of that leads me to the conclusion that, when I look

1  at 11 USC Section 329, that the compensation that Sagaria Law

2  received in its transactions with Mr. Gordon, beginning one

3  year after the filing of the case, exceeded the reasonable

4  value of services rendered.

5     Oh, and there is one other factual matter that ties in

6  then with that.  The $5,000 was received and Sagaria Law did

7  not file a statement under Section, or under Federal Rule

8  2016(b) regarding the relation of the $5,000.

9     When the matter was raised to Sagaria Law at the time of

10  the initial hearing on the Section 329 motion, the response

11  was, well, we don't think it's required because it was after

12  the petition.  And the argument on closing argument on why it

13  had been provided, why it had not been provided, even after

14  comments had been made from the bench at the hearing was,

15  well, we needed more guidance from the court, and part of my

16  guidance from the court is back to Section 329(b).

17     That compensation exceeds the reasonable value of

18  services and Sagaria Law owes the debtor $5,000 for that, for

19  those services.

20     In addition, I am persuaded that this constellation of

21  events was so defective, and particularly when I look at the

22  disclosure of compensation in the schedules, that excludes

23  basic bankruptcy items, in violation of the Local Bankruptcy

24  Rule on the point, specifically in which Sagaria Law states

25  that it has received $2,494 from the debtor and says that it

1 will not represent the debtor with respect to judicial lien

2 avoidances, relief from stay actions, both of which are

3 required by the Local Rules to be covered by the basic

4 Chapter 7 bankruptcy fee, because the alternative amounts to

5 putting a debtor into a bankruptcy case and then dumping the

6 debtor on the court unrepresented, to the detriment of the

7 court and the bankruptcy system.

8     So those problems lead me to conclude that the

9 compensation in the parent case was, likewise, exceeds the

10 reasonable value of services, by all amounts in excess of

11 what a petition preparer could charge, and I will issue an

12 appropriate order on that respect.

13     Now, there also has been substantial evidence provided

14 regarding the expenses, the legal expenses that Mr. Gordon

15 has dealt with, with Mr. Mislah and Mr. Lusk, to try to

16 extricate himself from this situation, and the adversary

17 proceeding is in fact proceeding.  And he has identified fees

18 in excess of $10,000, and I've been asked to order Sagaria

19 Law to pay those amounts.

20     The authority that has been cited for that is 28 USC

21 Section 1927.  The problem with that is that Section 1927, in

22 addition to having a threshold, a threshold requirement of a

23 determination of bad faith, which is in the 9th Circuit case

24 law, limits the authority of the court to the courts of the

25 United States or the territories thereof, and "court of the

1  United States" is referred to in the definitional section of

2  that sub-chapter, or that chapter of Title 28, as a judicial

3  officer with life tenure.

4      Accordingly, the 9th Circuit, in accordance in that

5  sub-chapter, specifically, 28 USC Section 1915, has ruled

6  that a bankruptcy court does not qualify as a court of the

7  United States and 1915 is for the in forma pauperis

8  provisions.

9      So although I have pointed out, in a dissent in a 9th

10 Circuit Bankruptcy Appellate Panel opinion, that the

11 inclusion of territories of the United States may open the

12 door to construing Section 1927, such that life tenure is not

13 required, the state of the law with respect to Section 1927

14 in this circuit is that I do not have the authority to do

15 that.

16     But interestingly enough, I do have authority under

17 Chambers v. Nasco, also known in the 9th Circuit as Rainbow

18 Magazine, under the court's inherent authority to control

19 matters, to consider sanctions on that basis as well.

20     The difficulty with acting on those today is that

21 Sagaria, that the debtor's counsel has not focused on the

22 issue, and more importantly, Sagaria Law has not had an

23 opportunity to focus on the issue.

24     And accordingly, I will set the matter, that matter for

25 further briefing and presentation, so that Mr. Lusk can make

1  the case under the court's inherent authority and Sagaria Law

2  can have the opportunity to respond appropriately.

3      And with that, that concludes my findings of fact and

4  conclusions of law and I will issue an appropriate order, or

5  an appropriate set of orders.

6      All right.  That concludes the Gordon matter.

7      (The proceedings were concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

23

STATE OF CALIFORNIA   )
                      ) ss.
COUNTY OF SACRAMENTO )


     I, JILL R. MCLEOD, Official Pro-Tem Reporter of the

United States Bankruptcy Court, Eastern District of

California, do hereby certify that the foregoing pages, 1-23,

comprise a full, true and correct transcription of my

stenographic notes in the aforementioned case of the

proceedings held on August 20, 2015.



Dated this 21st day of September 2015.



                         ---------------------------

                         JILL R. MCLEOD, CSR 10071